United States Court of Appeals
For the Eighth Circuit
_____

No. 24-1608
_____

Robert Zeidman

*Petitioner - Appellee*

v.

Lindell Management LLC

*Respondent - Appellant*
_____

Appeal from United States District Court
for the District of Minnesota
_____

Submitted: October 23, 2024
Filed: July 23, 2025
_____

Before LOKEN, SMITH, and GRASZ, Circuit Judges.
_____

LOKEN, Circuit Judge.

     Minnesota entrepreneur Michael Lindell prominently challenged the results and legitimacy of the 2020 presidential election. On news networks, internet news sources, and his streaming channel, Lindell repeatedly claimed to possess data showing that China interfered with the election in multiple states and that his view was informed by experts who had analyzed the data. Lindell also created Lindell Management LLC ("LMC") to host a "Cyber Symposium" in South Dakota in August

2021, during which LMC would provide cyber data and packet captures from the 2020 election that would prove election interference. LMC advertised a "Prove Mike Wrong Challenge" in which contestants would attempt to "[f]ind proof that this cyber data is not valid data from the November Election. For the people who find the evidence, 5 million [dollars] is their reward."

Robert Zeidman, who has 45 years of software development experience, was invited to the Symposium after LMC vetted his credentials. Zeidman entered the Challenge, signing its Official Rules. After reviewing eleven data files LMC provided, claiming they were from the November 2020 election, Zeidman submitted a fifteen-page report concluding that the data "unequivocally does not contain packet data of any kind and do[es] not contain any information related to the November 2020 election." The Challenge judges concluded Zeidman had not provided sufficient proof that the data was not unequivocally election data and denied his claim for the $5 million reward.

In accordance with the Official Rules, Zeidman filed an arbitration demand. After a three-day hearing, the arbitration panel (the panel) unanimously found that Zeidman won the Challenge Contest and ordered LMC to pay the $5 million reward. The panel concluded the contract requirement that participants "unequivocally" prove that the cyber data provided was not "related to the November 2020 election" was unambiguous and Zeidman unequivocally proved the cyber data was not "packet capture data." Zeidman filed a motion in the district court to confirm the panel's award; LMC filed a state court action to vacate the award, which Zeidman removed to federal court. Applying the "very limited" judicial review of arbitration awards under Sections 9 and 10 of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 9-10, the district court confirmed the panel's decision and denied LMC's motion to vacate, concluding the panel "arguably interpreted and applied the contract." LMC appeals. We conclude that the panel effectively amended the unambiguous Challenge contract when it used extrinsic evidence to require that the data provided was packet capture

-2-

data, thereby violating established principles of Minnesota contract law and our arbitration precedents. Accordingly, we reverse the grant of Zeidman's motion to confirm because "the arbitrators exceeded their powers." 9 U.S.C. § 10(a)(4).

## I. Background

Publications promoting the Cyber Symposium said that Mr. Lindell would reveal "cyber data and packet captures from the 2020 November election" to prove China's interference in that election. Before the Challenge, LMC gave the data it would provide contestants to a group of software professionals for their review. The experts were surprised and raised concern to LMC that the data format they received was not packet capture data (or "PCAP files"). The panel opinion explained that data format concerns how computer networks transfer data. When packet capture data is transferred, the contents are sent in packets with binary data that specifies the IP address of the machine that sent the data, the IP address of the recipient, and the dates of sending and receipt. Packet data is typically stored in PCAP files because, as a Challenge judge explained, "everything on the internet is in packets. So when you capture it, it's a packet capture."

Zeidman entered the Challenge and signed the contest's Official Rules. There was no entry fee. The Contest provided him eleven files, a portion of the total data. After reviewing each file, Zeidman submitted a fifteen-page report explaining that "the data Lindell provides . . . unequivocally does not contain packet data of any kind and do[es] not contain any information related to the November 2020 election." The Challenge judges determined that Zeidman had not provided sufficient proof that the data unequivocally was not election data.

**A. The Official Rules.** The Challenge's Official Rules that Zeidman signed provide as relevant here (emphasis added):

-3-

1. **Overview.** [LMC] has created a Challenge where participants will participate in a challenge to *prove that the data [LMC] provides, and represents reflects information from the November 2020 election, unequivocally does NOT reflect information related to the November 2020 election* (the "Challenge"). . . .

5. **Contest Entry Period.** . . . Participants must submit all of their evidence in writing to a three member panel selected by [LMC] who will determine whether the submission *proves to a 100% degree of certainty that the data shown at the Symposium is not reflective of November 2020 election data.*

6. **Winners.** The winners will be determined on August 12, 2021 by 8:00 pm CDT. The three-member panel selected by [LMC] will identify the winners based on their professional opinion that *the submission proves to a 100% degree of certainty that the data shown at the Symposium is not reflective of November 2020 election data*. . . .

7. **General Conditions.** . . . In the event there is an alleged or actual ambiguity, discrepancy or inconsistency between disclosures or other statements contained in any Challenge-related materials and/or these Official Rules (including any alleged discrepancy or inconsistency in these Official Rules), it will be resolved in [LMC]'s sole discretion. . . .

8. **Governing Law.** *This Contest and any dispute arising under or related thereto (whether for breach of contract, tortious conduct, or otherwise) will be governed by the internal laws of the State of Minnesota* . . . .

9. **ARBITRATION.** YOU AND LINDELL AGREE THAT IN THE EVENT OF ANY CLAIM, DISPUTE, OR CONTROVERSY (WHETHER IN CONTRACT, TORT, OR OTHERWISE) ARISING OUT OF, RELATING TO, OR CONNECTED IN ANY WAY WITH THE CHALLENGE, *OR THE BREACH, ENFORCEMENT, INTERPRETATION, OR VALIDITY OF THESE TERMS & CONDITIONS ("CLAIM")*, SUCH CLAIM *WILL BE RESOLVED EXCLUSIVELY BY FINAL AND BINDING ARBITRATION.*

Appellate Case: 24-1608    Page: 4    Date Filed: 07/23/2025 Entry ID: 5540031

ARBITRATION IS MORE INFORMAL THAN A LAWSUIT IN COURT AND USES A NEUTRAL ARBITRATOR INSTEAD OF A JUDGE OR JURY. *ARBITRATION IS SUBJECT TO VERY LIMITED REVIEW BY COURTS, BUT ARBITRATORS CAN AWARD THE SAME DAMAGES AND RELIEF THAT A COURT CAN AWARD.* THE ARBITRATION WILL BE CONDUCTED UNDER THE THEN CURRENT RULES OF THE AAA AND CONDUCTED IN ENGLISH. . . .

**B. The Arbitration Award.** Zeidman, in accordance with these Rules, filed an arbitration demand. The parties submitted three specific issues for determination by the panel: (1) whether Zeidman won the Challenge and LMC was in breach of contract by not paying the $5 million reward; (2) whether the Official Rules were unconscionable; and (3) whether LMC violated the Minnesota Consumer Fraud Act by designing a contest knowing there would not be a winner and by failing to provide promised data. Applying Minnesota law and limiting its review to the eleven data files provided to Zeidman and cited in his report, the panel determined that Zeidman performed under the Official Rules, LMC breached the contract by not paying him the reward, and the remaining two tort issues were therefore moot.

To decide the breach of contract claim, the panel explained that it needed to interpret two key phrases in the Official Rules. The first phrase was that a winning contestant must "prove that the data [LMC] provides . . . unequivocally does NOT reflect information related to the November 2020 election." The second key phrase was "whether the [participant's] submission proves to a 100% degree of certainty that the data shown at the Symposium is not reflective of *November 2020 election data*." The panel then addressed the governing principles of Minnesota contract law that it must apply:

> The intent of the parties is determined from the plain language of the written agreement, so long as the agreement is clear and

unambiguous. The Panel should consider extrinsic evidence only if the document itself is ambiguous. [Citations omitted.]

*   *   *   *   *

Both parties contend that the rules are unambiguous, and no parol evidence is required for contract interpretation. Lindell LLC argues that one need only consult a dictionary to interpret the contract. . . . It argues that the data need only be connected to or about the election in some way. . . .

Mr. Zeidman argues that definition is far too broad and is "neither reasonable nor consistent with Mr. Lindell's claims about the data."

The Panel has determined that the Contest rules are directed to data "from the election" also referred to as "election data."

These terms require the data not merely be about the election, but must be from the election process itself. . . . [T]his would be packet capture data. Thus, if data is not PCAP data, it is not from the election, and it therefore cannot be "related to the November 2020 election". . . .

. . . [T]here is not, in the Panel's view, any ambiguity, discrepancy, or inconsistency to be resolved here, and the parties have both stated the contract is unambiguous.

The panel further noted that Mr. Lindell and his cyber-expert witnesses "admitted that data to be provided from the election was to be in the form of packet data or PCAP data." LMC argued that Zeidman and other witness acknowledged that election data could be in another form than PCAP data. "It is, however, undisputed," the panel noted, "that election data that is captured from the internet, which Mr. Lindell said he would provide, would be in packets. This is because all data delivered over the internet is in the form of packets."

-6-

The panel then examined in detail the proof Zeidman presented regarding the eleven files, his expert's support for the analysis, and LMC's experts' responses. The panel concluded that Zeidman proved that the files provided were not in PCAP format; therefore, they were not election data. Because Zeidman performed under the Official Rules, the panel awarded him the $5 million reward.

**C. The District Court Decision.** After removal and consolidation of the competing FAA petitions to vacate or to confirm the panel's decision, LMC argued that the district court should vacate the arbitration award because "the panel acted outside the scope of its authority by modifying the Challenge rules . . . [by] inputting the requirement of packet capture data and reversing the burden such that it rested with [LMC]." The court agreed with the panel that its interpretation of the Official Rules -- requiring that data specifically be from the election process -- harmonized the contract. But the court "[found] it to be quite a leap that the only possible data that could constitute 'election data' would be packet capture data." The court inferred that the panel used extrinsic evidence to reach this interpretation of unambiguous contract language, contrary to Minnesota contract law. But "even the potentially serious legal error of using extrinsic evidence to interpret an unambiguous term is not enough to vacate an award" because the panel "was arguably interpreting and applying the contract." Accordingly, the district court granted Zeidman's motion to confirm the award, denied LMC's motion to vacate the award, and awarded Zeidman $5 million. This appeal followed.

## II. Discussion

The FAA "establishes a liberal federal policy favoring arbitration agreements." Epic Sys. Corp. v. Lewis, 584 U.S. 497, 505 (2018) (quotation omitted). "Where parties agree to arbitrate, a court cannot substitute a judicial determination for the arbitrator's decision." Gas Aggregation Servs., Inc. v. Howard Avista Energy, LLC, 319 F.3d 1060, 1064 (8th Cir. 2003). Deference is not unlimited. Section 10(a) of

the FAA, 9 U.S.C. § 10(a)(1)-(4), sets forth statutory limits on an arbitrator's discretion, providing that an award may be vacated if the reviewing court determines (1) that "the award was procured by corruption, fraud, or undue means;" (2) "there was evident partiality or corruption"; (3) "the arbitrators were guilty of [specified types of procedural misconduct];" or (4) "the arbitrators exceeded their powers . . . ." LMC seeks vacatur of the panel's decision under § 10(a)(4), arguing the arbitration panel exceeded its authority in interpreting the parties' contract.

"[A]n arbitrator's authority is contractual. Therefore, the threshold question whether the parties to the Arbitration Agreement agreed to arbitrate a particular dispute -- the dispute's 'substantive arbitrability' -- is a question for the court (unless the parties agreed that the arbitrator should decide arbitrability)." Brown v. Brown-Thill, 762 F.3d 814, 818 (8th Cir. 2014), citing First Options of Chicago, Inc. v. Kaplan 514 U.S. 938, 942-44 (1995). As the Supreme Court has noted, "so-called 'questions of arbitrability' . . . which include certain gateway matters, such as whether parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy . . . are presumptively for courts to decide." Oxford Health Plans LLC v. Sutter, 569 U.S. 564, 569 n.2 (2013). Here, however, substantive arbitrability is not at issue. Section 9 of the Official Rules provides that "any claim, dispute, or controversy . . . arising out of, relating to, or connected in any way with the challenge, or the breach, enforcement, interpretation, or validity of these [Rules] . . . will be resolved exclusively by final and binding arbitration." Zeidman and LMC jointly submitted to the arbitration panel the issue whether Mr. Zeidman won the Prove Mike Wrong Challenge contest, so that LMC breached its contract with Zeidman by not paying him $5 million reward.

Rather than arbitrability, LMC argues the panel "exceeded its authority" by imposing a new obligation on LMC and ignoring unambiguous contract terms. As the district court recognized, "courts are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on

-8-

misinterpretation of the contract." Alvey, Inc. v. Teamsters Loc. Union No. 688, 132 F.3d 1209, 1211 (8th Cir. 1997) (quotation omitted). "[A]s long as the arbitrator is even arguably construing or applying the [agreement] and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." Associated Elec. Co-op., Inc. v. Int'l Bhd. of Elec. Workers, Loc. No. 53, 751 F.3d 898, 901 (8th Cir. 2014), quoting United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 38 (1987).

However, an arbitrator may not ignore the plain language of the contract or impose his own notions of "industrial justice." See, e.g., United Steelworkers of Am. v. Enter. Wheel & Car Corp., 363 U.S. 593, 597 (1960) (an award "must 'draw its essence' from the [agreement], not merely reflect '[the panel's] own brand of industrial justice.'"), quoting United Steelworkers of Am. v. Enter. Wheel & Car Corp., 363 U.S. 593, 597 (1960). Likewise, an arbitration award may be vacated if it evidences "manifest disregard for law" -- if the panel based its decision on "some body of thought, or feeling, or policy, or law that is outside the contract." CenterPoint Eneregy Res. Corp. v. Gas Workers Union, Loc. No. 340, 9020 F.3d 1163, 1167 (8th Cir. 2019), quoting Ethyl Corp. v. United Steelworkers of Am., 768 F.2d 180, 185 (7th Cir. 1985).

In Hoffman v. Cargill, Inc., which involved arbitration of a commercial dispute, we held:

> These extra-statutory standards are extremely narrow: An arbitration decision may only be said to be irrational where it fails to draw its essence from the agreement, and an arbitration decision only manifests disregard for the law where the arbitrators clearly identify the applicable, governing law and then proceed to ignore it.

236 F.3d 458, 462 (8th Cir. 2001); see St. John's Mercy Med. Ctr. v. Delfino, 414 F.3d 882, 884 (8th Cir. 2005) (an arbitration award evidences manifest disregard for

-9-

Appellate Case: 24-1608   Page: 9   Date Filed: 07/23/2025 Entry ID: 5540031

the law only when "an arbitration panel cites relevant law, then proceeds to ignore it") (quotation omitted). When evaluating whether the panel exceeded its powers, we ask whether the award "draws its essence" from the Challenge agreement. PSC Custom, LP v. United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, Loc. No. 11-770, 756 F.3d 627, 630 (2014).

As the arbitration panel recognized, under Minnesota law when a written contract is unambiguous, the intent of the parties is to be determined from the plain language of the contract alone. See Travertine Corp. v. Lexington-Silverewood, 683 N.W.2d 267, 271 (Minn. 2004); Alpha Real Est. Co. of Rochester v. Delta Dental Plan of Minn., 664 N.W.2d 303, 312-13 (Minn. 2003). Our decisions reviewing arbitration awards adhere to these principles. See Trailmobile Trailer, LLC v. Int'l Union of Elec., Elec., Salaried, Mach. & Furniture Workers, 223 F.3d 744, 747 (8th Cir. 2000) ("the arbitrator may not disregard or modify unambiguous contract provisions"); Excel Corp. v. United Food & Com. Workers, 102 F.3d 1464, 1468 (8th Cir. 1996) ("The arbitrator's reliance on parol[] evidence was erroneous because the plain language in the applicable portions of the CBA is clear and unambiguous."); Keebler Co. v. Milk Drivers & Dairy Emps. Union, Loc. No. 471, 80 F.3d 284, 288 n.4 (8th Cir. 1996) ("An arbitrator may not ignore the plain language of the contract because that would, in effect, amend the contract."); Inter-City Gas Corp. v. Boise Cascade Corp., 845 F.2d 184, 187 (8th Cir. 1988) ("if the arbitrator interprets unambiguous language in any way different from its plain meaning, the arbitrator amends or alters the agreement and acts without authority") (cleaned up).

LMC argues the panel exceeded its authority (committed legal error) when it interpreted the Official Rules to "require the data not merely be about the election, but must be from the election process itself," rejecting LMC's contention that a winning contestant must prove that the data provided did not "reflect information *related to*" or was not "*reflective of*" the election. LMC reasons that Official Rule 8 provides that "any dispute arising under . . . will be governed by the internal laws of the State

-10-

of Minnesota." The parties agreed that the Rules are unambiguous, and Minnesota law provides that, in interpreting unambiguous contracts, the intent of the parties must be determined from the language of the contract alone without resort to extrinsic evidence. We agree.

A general choice of law provision does not modify the Federal Arbitration Act's limited standard for judicial review of arbitration awards. See UHC Mgmt. Co. v. Computer Sciences Corp., 148 F.3d 992, 998 (8th Cir. 1998). But here, the panel explicitly agreed with the parties that the relevant contract terms were unambiguous, recognized that Minnesota law governed and therefore barred the use of extrinsic evidence to interpret the unambiguous provisions, and then used extrinsic evidence to rule that Zeidman won the Challenge Contest because the data LMC provided contestants was not "PCAP data." Under our controlling decisions, the panel exceeded its authority because it "clearly identif[ied] the applicable, governing law and then proceed[ed] to ignore it." Hoffman, 236 F.3d at 462.

Purporting to be interpreting the Official Rules, the panel determined, though "packet capture" and "PCAP data" are not mentioned in the Official Rules, that "if data is not PCAP data, it is not from the election, and it therefore cannot be 'related to the November 2020 election.'" It based this conclusion almost entirely on extrinsic evidence -- Lindell's pre-Challenge publicity describing the data and the views of experts who had analyzed the data; LMC's advertising of the Challenge Contest; that the software engineers retained to review the data expected it to be packet capture data; and Zeidman's report opining that the data provided "do not contain any information related to the November 2020 election." In the panel's view, LMC's contention that the term "relating to the election" should be broadly construed "would be unreasonable" because then "the Contest would not really be a contest at all." Whatever one might think of the logic of the panel's reasoning, it is contrary to Minnesota law. When a contract is unambiguous, "evidence of the circumstances surrounding the [agreement's] negotiation and formation" is extrinsic and may not be

-11-

considered. Minn. Vikings Football Stadium, LLC v. Wells Fargo Bank, Nat'l Ass'n, 193 F. Supp. 3d 1002, 1012 n.5 (D. Minn. 2016).

From the four corners of the Challenge contract as defined by the Official Rules, there is no way to read "information *related to* the November 2020 election" as meaning only information that is "PCAP data." The panel thus did more than construe an ambiguous contract term. Adding a form-of-data requirement imposed a new obligation upon LMC, effectively "amending the [contract]." Keebler, 80 F.3d at 288. Fair or not, agreed-to contract terms may not be modified by the panel or by this court. On this record, "[t]he conclusion is inescapable that the panel simply imposed its own conception of sound policy." Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 675 (2010).

For the foregoing reasons, the judgment of the district court is reversed and the case is remanded with directions either to grant LMC's Motion to Vacate Arbitration Award or for further proceedings not inconsistent with this opinion.

_____